Eugene HOWARD, Plaintiff in Error,

v.

STATE of Tennessee, Defendant in Error.

Court of Criminal Appeals of Tennessee.

Jan. 16, 1976.

Certiorari Denied by Supreme Court April 12, 1976.

Jerry H. Summers, Chattanooga, for plaintiff in error.

R. A. Ashley, Jr., Atty. Gen., William C. Koch, Jr., Asst. Atty. Gen., Nashville, David H. Rotroff, Asst. Dist. Atty. Gen., Chattanooga, for defendant in error.

## OPINION

GALBREATH, Judge.

Basically at issue in this appeal is whether the evidence adduced on behalf of the State sufficiently linked the defendant, Eugene Howard, a Chattanooga policeman, with the sale of more than three pounds of marijuana to an undercover agent. The evidence has been accurately, with one glaring exception, summarized in the State's brief as follows:

"At approximately 3:00 p. m. on November 4, 1973, Donald McKeel, an undercover narcotics agent of the Chattanooga Police Department, met the defendant, another police officer, and his friend Donnie Burns, a city fireman, in the parking lot of Wileys' Draft Inn on Old Harrison Pike. As McKeel was getting into his car, the defendant drove up in his car and called to him "I got fifteen pounds in . . . would you like to buy some of it?" McKeel told the defendant that he would have to go to the bank because he did not have any money with him; to which the defendant replied: "Come on and get in the car, and we'll go over there and get it now". The agent responded that it was too late to go to the bank and that he would get in touch with the defendant later.

Agent McKeel contacted his supervisor Agent Joe Frank McCullough and Captain Pat Rowe about this incident. Subsequently, on November 7, 1973, Agent Rowe made a series of three telephone calls to the defendant at the county jail where he worked. The calls were made from Agent McCullough's home in the presence of McCullough and Rowe and were also tape recorded. The first call took place at approximately 11:20 a. m. contained the following conversation, in part:

'MR. HOWARD: City jail, Howard.

MR. McKEEL: Is this Officer Howard?

\*     \*     \*     \*     \*     \*

MR. HOWARD; What do you need, Donnie McKeel?

MR. McKEEL: I need Smiley Burns.

MR. HOWARD: Well, he's over at Raymond Rogers' house, and I don't have Raymond's number, but he might be still over there, but if he ain't, call the Ramada Inn.

MR. McKEEL: Well, you ain't worth a shit, Gene.

MR. HOWARD: He's supposed to call me at 2:30. How quick do you have to get ahold of him?

MR. McKEEL: Well, that would be fine this evening. Do you know what I'm talking about?

MR. HOWARD: Yeah.

MR. McKEEL: I want to get them this evening.

MR. HOWARD: Well, he probably wants you to get them too.

MR. McKEEL: Will he?

MR. HOWARD: Yeah. Let me— where you at?

\*     \*     \*     \*     \*     \*

MR. HOWARD: If not—well, look here, call me back in about, oh, an hour, that way I can tell you if I got ahold of him.

MR. McKEEL: Okay, and tell him what I need, hear?

MR. HOWARD: Okay.'

Agent McKeel made the second call as arranged, but failed to reach the defendant so he placed a third call at approximately 12:14 p. m. The following conversation ensued:

'MR. HOWARD: City jail, Howard.

MR. McKEEL: Geno.

MR. HOWARD: Okay, hold on a minute.

MR. McKEEL: All right.

    \*    \*    \*    \*    \*    \*

MR. McKEEL: Did you get in touch with him?

MR. HOWARD: Yeah, he's—call him at home, 622, you know, 1302, ain't that his number?

    \*    \*    \*    \*    \*    \*

MR. McKEEL: Yeah, you told him what I needed, though.

MR. HOWARD: Yeah.

MR. McKEEL: Okay, he'll take care of it?

MR. HOWARD: Yeah.'

Following these telephone conversations, Agent McKeel received five marked one hundred dollar bills from Agent McCullough who had already recorded their serial numbers. At approximately 4:30 p. m. McKeel left the Mark Inn and drove alone to Kay's Ice Cream. Agents McCullough and Rowe followed McKeel and parked across the street so that they could observe the transaction. McKeel met Smiley Burns' wife in the parking lot of Kay's Ice Cream. He parked next to Mrs. Burns' car, got out of his car, and got into the passenger side of her car. There he saw a large green trash bag containing approximately four pounds of marijuana. The agent gave Mrs. Burns the five one hundred dollar bills he had received from Agent McCullough. He then got out of the car and Mrs. Burns drove off up Stuart Street.

As she drove away, McCullough and Rowe drove into the parking lot and took the bag from McKeel. After obtaining this evidence, Rowe and McCullough chased Mrs. Burns down Stuart Street and caught her three or four blocks from the scene of the transfer. She still had the five hundred dollar bills clutched in her right hand. Later, McKeel met Rowe and McCullough in the parking lot of the Red Food Store and filled out a report of the incident. Smiley Burns was arrested approximately four hours later at the defendant's home. The defendant was arrested and charged at a later date.

The defendant took the stand in his own defense. He did not dispute any of the statements made in the taped telephone conversations and admitted that he knew that McKeel was trying to purchase marijuana. He claimed that he was working with another officer, George Walden, who was investigating McKeel, and that he had no intention of ever arranging for a purchase of marijuana. He also denied meeting Officer McKeel in the parking lot of Wiley's Draft Inn on November 4, 1973. Officer Walden indicated that he was investigating the defendant and Smiley Burns. He testified that he knew that the defendant and Smiley Burns were friends and that he was aware that Burns had been dealing in drugs."

█ We must call the State's attention to omitted undisputed evidence in the record that tends to support the defendant's contentions that he did not make the arrangements culminating in the sale of the drug to the undercover agent he claimed to be investigating himself. Agent McKeel testified on both direct and cross-examination that he, not the defendant, made the arrangements by telephone to purchase the marijuana from Mrs. Linda Burns, not Smiley Burns who his conversations with the defendant indicated would be the seller.

While it is altogether possible that the defendant had communicated McKeel's desire to purchase the drug from Burns who, in turn, enlisted his wife as agent in completing the transaction, it is just as possible that Mrs. Burns was acting on her own without her husband's knowledge. The natural although completely rebuttable assumption that may give rise to a strong suspicion that husband and wife act with the knowledge and approval of one another does not exclude the defendant's theory that they may not have been, on this occasion, or that he had no contact with either.

█ The wife may have been acting as her husband's agent but no proof of such

agency is found in the record. Even in such an apparent principal-agent relationship as that existing between druggist and a clerk making unlawful sales of drugs from the store's stock it has been held that proof was material to establish the authorization. *People v. Zito,* 237 Ill. 434, 86 N.E. 1041. In Tennessee a wife is not considered as such to be her husband's agent unless it is made to appear that he has expressly or impliedly sanctioned what she has done. *Catron v. Warren,* 41 Tenn. 358. Surely this rule which protects those against whom civil liability is sought as a result of a wife's transaction will protect those against whom criminal liability is charged.

The defendant's criminal responsibility rests on even more tenuous grounds than would the seller's husband since it would be derivative from an unproved authorization from one spouse to the other. It is not within our province to instruct those engaged in police work how to conduct their business, but it would seem that with very little additional effort or forbearance the defendant, if he did play a role in having Mrs. Burns sell the drug, could have been more directly linked with the crime. As matters appear from the record the circumstantial evidence relied on does not establish guilt.

"This is a circumstantial evidence case and the rule is well settled that the evidence must be consistent with the guilt of the defendants and inconsistent with their innocence, and sufficiently strong to overcome every other reasonable hypothesis except that of guilt." *Marie v. State,* 204 Tenn. 197, 319 S.W.2d 86.

Error is assigned to the action of the trial judge in restricting testimony of witnesses relative to investigations allegedly being conducted by the defendant and other police personnel of suspected crimes committed by the principal state witness McKeel. In the event of retrial the defendant should be permitted to develop this proof to shed more light on his contention that he was deliberately attempting to mislead the undercover agent in his telephone conversations relative to assisting in the purchase of drugs as part of his efforts to obtain incriminating evidence of the agent's participation in criminal activity. The restricted evidence to this effect was not offered on the collateral issue of credibility of the undercover agent, but on the principle issue of intent. The excluded evidence on this point would have bolstered the only defense advanced.

Other assignments urged on us have been considered and found unmeritorious.

Reversed and remanded.

WALKER, P. J., and DUNCAN, J., concur.